April 21, 2010

Robert M. Lyden
18261 S.W. Fallatin Loop
Aloha, OR 97007

James A. Niegowski
Patent Counsel
NIKE, Inc.
One Bowerman Drive
Beaverton, Oregon 97005

Dear Jim,

I hope you're doing well.

For your information, I have reviewed patents in the footwear industry recently and came across a number of NIKE patents which I would like to discuss with you.

As you know, I provided NIKE with hard copies of my relevant patents or patent applications in 2002, and also provided you with electronic copies of my footwear patent applications corresponding to U.S. 7,016,867 and U.S. 7,107,235 as a courtesy in 2006 for the purpose of facilitating due diligence efforts in the patent department at NIKE and your outside patent counsel at Banner & Witcoff, Ltd.

I will provide you with some of the basic facts and outline the potential issues below so that we can discuss what may be the most productive course of action for NIKE:

**1.  NIKE patents U.S. 7,347,011, U.S. 7,131,296, U.S. 6,986,269, and U.S. 6,931,762 by Bhupesh Dua for "Article of Footwear Having a Textile Upper," and "Footwear With Knit Upper And Method Of Manufacturing The Footwear" which are directed to knitted uppers, and also U.S. 6,910,288 by Dua for "Footwear Incorporating A Textile With Fusable Filaments And Fibers."**

My prior patent documents which had been previously disclosed to NIKE were not cited in the IDS(s) for these cases.  See Figures 570-575 in U.S. 7,107,235 for "Method of Conducting Business Including Making and Selling A Custom Article of Footwear," and in particular, see Figure 573 and the discussion found in Columns 199-201.  Further, Column 199 includes a list of prior art patents (most of which have not been cited in the NIKE patents by Dua) which I had incorporated by reference.  In brief, I previously taught and filed patents for substantially the same structure later recited by Dua.

1

**2. NIKE patent U.S. 7,600,332 and pending U.S. 2010/0000125 by Mario Lafortune.**

Perhaps, you can help me to understand something which I may be missing regarding these two patents, as I'm not sure what Lafortune and NIKE are thinking here.  Obviously, there is a lot of prior art relating to insoles and footwear construction, but only five patents were cited in this case.  In this regard, NIKE didn't provide **ANY** prior art patents to the examiner in an IDS.  As a result, my prior patent documents which had been previously disclosed to NIKE were not cited.   In this regard, see my U.S. 7,107,235 which probably includes over 100 drawing Figures showing insoles having at least one indentation on the bottom side for mating with a protrusion, e.g., see Figures 4, 38, 449, 467, 469, 470, 473, and 482.  See also Figures 331, 333, 334, 361, 362 regarding mating parts relating to means for cushioning in the rearfoot area of an article of footwear.

**3.  U.S. 6,914,596 and U.S. 7,076,890 by James Grove and Eric Avar assigned to NIKE for "Footwear With Separable Upper And Sole Structure," and the continuation U.S. 7,444,763 in which two additional inventors were added, namely, Bruce Kilgore, and Michael Friton, and also U.S. Patent Application serial number 12/207,309.**

I believe there are many issues associated with these three NIKE patents.  One question concerns why Kilgore and Friton were added as inventors to U.S. 7,444,763, but were not named inventors on the first two parent cases which included the same structure?  However, a more serious question is why did NIKE file patent applications in 2003, 2005 and 2006 for matter that was largely contained in my patent applications filed in 2001 and 2002, and in particular, as these patent applications had been provided and publicly disclosed to NIKE in March of 2002?

As you know, I became aware of the existence of patent application serial number 10/349,398 now U.S. 6,914,596 after it was published and while this patent was being prosecuted in the U.S. Patent Office.   I had called and met with you for lunch to discuss this NIKE application and then showed you, e.g., Figure 491-492, and 554 of my patent application serial number 10/279,626 now U.S. 7,107,235.   Your immediate response upon seeing my Figure 492 was and I will here quote was simply:  "Oh s--t."   I thought you would follow up by either abandoning the patent application, or narrowing the pending claims.   In any case, I thought you would make my relevant patents and also the detailed information that I had provided to you regarding where to direct the examiner's attention in the drawing figures of record by filing a supplemental IDS in the NIKE case.

2

However, I later discovered that NIKE made my patent applications published as 2003/0051378 and 2003/0069807, now U.S. 7.016,867, and U.S. 7.107,235 of record, but did not indicate to the examiner where to find the relevant matter shown, e.g., in Figures 491-492, and 554.  The IDS forms which NIKE uses includes designated areas for indicating such relevant information, but it was not used.  Further, I then learned that NIKE had been granted U.S. 6,915,596 and had also filed a continuation which matured as U.S. 7,076,890.

In addition, I discovered that NIKE had filed yet another continuation patent application serial number 11/443,617 having method claims which was later granted as U.S. 7,444,763.   Some of the claims in U.S. 7,444,763 generally resemble those which NIKE was aware I had filed and prosecuted in my U.S. 7,016,867 and U.S. 7,107,235.  As mentioned previously, Bruce Kilgore and Michael Friton were added as inventors during the prosecution of NIKE's U.S. 7444,763.  This seemed unusual given that the two parent NIKE cases had a different inventorship and had already been granted.

As you know, I filed three protests against pending serial number 11/443,617 which later matured as U.S. 7,444,763.   Unfortunately, the examiner was not able to carefully review or make all of these protests of record during the prosecution.  Besides reciting my own patents in these three protests, I had provided the examiner and NIKE with copies of U.S. 2,931,110 to Roberto Pietrocola, and also U.S. 3,810,318 to Roland Epstein which is believed to be one of the most relevant of the prior art patents.  However, these two patents were not cited on NIKE's U.S. 7,444,763 when it issued.  NIKE's outside patent attorney handling the case at Banner & Witcoff, Ltd., William Rauchholz, to his credit, requested that my three protests be considered, but it was too late in the prosecution to do so and the case issued as U.S. 7,444,763.

 Nevertheless, the examiner initiated a re-exam and so a continuation patent application serial number 12/207,309 was filed on September 9, 2009.  For some reason, the IDS submissions provided early in the prosecution of serial number 12/207,309 did not include all of my patents and the two prior art patents that I provided in the protests, nor were copies of the three protests listed on the IDS.   And so in an early office action mailed April 30, 2009, the examiner indicated that Claims 1-34 were pending, that Claims 8 and 25 were withdrawn from consideration, and Claims 1-7, 9-24, and 26-34 were rejected due to potential double patenting, but would be allowed subject to the filing of a Terminal Disclaimer.

However, after a later IDS submitted by NIKE which was mailed on October 30, 2009 and which included all of my relevant patents, two prior art references which I had provided in the protests, three others which NIKE made of record, and also my three protests was considered by the examiner on December 2, 2009,  the examiner indicated in an office action mailed on December 3, 2009 that Claims 1-7,10-19, 21-24, 26-29, and 31-34 were rejected

under U.S.C. 102(e) or 103(a) as being unpatentable over my U.S. 7,107,235. Dependent Claims 8, 9, 20, 25, and 30 were objected to as being dependent upon a rejected base claim, but would be allowable if rewritten in independent form including all of the limitation of the base claim and any intervening claims. In brief, the Examiner indicated that the matter defined in 29 of the 34 submitted claims was not allowable over my patents.  The normal three month period for responding to the office action of December 3, 2009 has already passed, and NIKE has not yet responded to the examiner.

In brief, if anyone is entitled to get broad claims for the subject matter which NIKE was unable to obtain, it is me.  In this regard, I could easily file a continuation or divisional application in order to do so.


**4. NIKE patent application U.S. 2009/0183392 A1 by S. Kohatsu Shane for "Footwear With Adjustable Size."**

In U.S. 7,107,235, see the discussion in Columns 199-201 regarding Figures 570-573 and also the "stretchable upper" option listed in Column 202, and in particular, see the discussion of Figure 573 in Column 200.  In brief, I have previously taught and filed for the use of stretch textile materials in making uppers for use with removable sole components having different sizes.

In this regard, U.S. 7,107,235 shows an article of footwear including a removable and replaceable portion of a sole which can extend partial length, or full length, e.g., as shown in Figures 254, 255, 258, 259, 260, 283, and 284.  The removable portion of the sole can be a simple registered or pressed friction fit with corresponding openings in the upper, or the removable sole can include undercuts 154 for mechanically engaging the upper in a snap fit manner as shown, e.g., in Figures 491, 492, and discussed at Column 183, and also shown in Figures 553, and 555.   As shown Figure 489, the removable sole portion can be made of a single material and this is discussed in Column 183.  As shown in Figures, 352, 353, 354, and also Figures 392 and 393, the removable sole can include traction members which extend not only downwards, but also laterally or sideways from a side portion of the removable sole through openings or apertures which are included about the sides of the upper.  Accordingly, pending NIKE patent application U.S. 2009/0183392 A1 by S. Kohatsu Shane for "Footwear With Adjustable Size" includes and reproduces essential features taught in my prior patents, e.g., U.S. 7,107,235.

**5. U.S. 7,451,557 by Steve McDonald et al. assigned to NIKE for "Article of Footwear With A Removable Midsole Element."**

This is another patent in which a portion of the midsole or outsole can be placed inside the upper and then ground engaging portions of the midsole or outsole can project through openings which are provided in the bottom side of the upper.   In particular, the allowed patent claims recite that the ground engaging lower surface of the removable midsole or outsole footwear component is disposed at a higher elevation than the other portion of the sole which is permanently secured to the upper.   Some of the traction members included on the midsole or outsole can also extend laterally from a side portion thereof to mechanically engage the rim section of the outsole which is affixed to the upper.

For your information, the IDS for this case lists two of my patent applications which have now been granted as U.S. 7,107,235 and 7,016,867, but the Examiner was not directed to the most relevant drawing figures.  In this regard, the IDS form used by NIKE includes a space for doing so, but this was not done.  U.S. 6,915,596, U.S. 7,076,890, and U.S. 7,444,763 by Grove et al. assigned to NIKE for "Footwear With Separable Upper And Sole Structure," are also directed to like subject matter, but they were not cited.

On the subject of inventorship, the named inventors on U.S. 7,451,557 are Steve McDonald and Bradley Long, whereas the named inventors on U.S. 6,914,596 and U.S. 7,076,890 are James Grove and Eric Avar, but on a later continuation which is now U.S. 7,444,763 two additional inventors were added, namely, Bruce Kilgore, and Michael Friton.   And so Kilgore and Friton apparently were not inventors on the first two cases which included the same structure?   In addition, two other NIKE patents relating to similar subject matter exist, namely, U.S. 7,140,129 by Marc Newson, Nicholas Register, Damon Clegg, Martin Lotti, Richard Clarke And Stephen Mellor For "Article Of Footwear With Perforated Covering And Removable Components," and also pending patent application U.S. 2009/0183392 by S. Kohatsu Shane for "Footwear With Adjustable Size." Accordingly, there are 13 inventors at NIKE named on the aforementioned group of 6 patents which are directed to similar subject matter.

However, I had disclosed to NIKE and filed patents including like subject matter before the filing date of *any* of these NIKE patents.   For example, my U.S. 7,107,235 shows an article of footwear including a removable and replaceable portion of a sole which extends substantially full length, e.g., see Figures 254, 255, 258, 259, 260, 283, and 284.  The removable portion of a sole can be a simple friction or registered fit with the openings in the upper, or the removable sole can include undercuts 154 for mechanically engaging the upper in a snap fit manner as shown, e.g., in Figures 491, 492, and discussed at Column 183, and also shown in Figures 553, and 555.   As shown Figure 489, the removable sole portion can be made of a single material and this is discussed in Column 183.  As shown in Figures, 352, 353, 354, and also Figures

392 and 393, the removable sole can include traction members which extend not only downwards, but also laterally or sideways from a side portion of the removable sole through openings or apertures which are not only on the bottom, but also about the sides of the upper.

As shown, e.g., in my U.S. 7,107,235 in Figures 351, 354, 554, 555, 574 and 575 the upper can include a plastic material 138 on the bottom, but also about a portion of all of its sides and so form a so-called "rim" as shown and claimed in U.S. 7,451,557 by McDonald and Long. As shown, e.g., in Figures 554 and 555 of my U.S. 7,107,235, the plastic material can serve as a wear resistant ground engaging portion of the sole 32 and the article of footwear can also include a permanent sole portion including a traction member 115. Accordingly, the idea of combining an upper including a permanent sole with a removable sole footwear component was not novel when the NIKE patent was filed over two years after my disclosures to the company, and also over a year after their publication. If all of this information had been made clear to the patent examiner at the time of prosecution would the mere recited difference in elevation of the removable sole component been sufficient to define patentable matter? In this regard, differences in the elevation of traction members on soles are known and common in the prior art. In particular, soles having traction members about the perimeter which project further downwards relative to those in the middle area of a sole were taught by Jerry Stubblefield in connection with the so-called cantilever sole, e.g., see U.S. 4,741,114, and also U.S. 4,817,278 which includes an exposed midsole portion.

**6. U.S. 7,140,129 by Marc Newson, Nicholas Register, Damon Clegg, Martin Lotti, Richard Clarke and Stephen Mellor assigned to NIKE for "Article Of Footwear With Perforated Covering And Removable Components.**

In brief, this is yet another patent generally similar to U.S. 7,451,557 by Steve McDonald et al., and U.S. 2009/0183392 A1 by S. Kohatsu Shane, and U.S. 6,915,596, U.S. 7,076,890, and U.S. 7,444,763 by Grove et al. in which a portion of the sole can be placed inside the upper and ground engaging portions of the sole can project through openings which are provided in the bottom side of the upper. Once again, see the discussion in paragraphs 3, 4 and 5 above. As you are aware, I filed for like subject matter in 2001 and disclosed my patent applications to NIKE in 2002. Employees at NIKE then filed for like subject matter over two years later. Further, my patents were not made of record during the prosecution of U.S. 7,140,129. Obviously, these actions and events are not proper for many reasons which I believe you can well understand.

6

**7.  NIKE patent application 10/099,685 by Potter et al. for "Custom Fit Sale of Footwear."**

I noticed this patent had been abandoned, but an appeal brief was then filed on December 19, 2008.  My U.S. 7,107,235 was one of the primary references used by the examiner to reject the claims in this case.  I do not know the current status of NIKE's appeal, but if my patents would be assigned to NIKE it could be possible for you to obtain the desired claims.

**8.  U.S. 7,100,308 by Mike Aveni for "Footwear With A Heel Plate Assembly."**

This patent was filed on November 31, 2003 over a year after NIKE had been provided with my pending patent applications, and had informed me that the company did not have an interest in my intellectual property.  In brief, see Figures 83-89, and 249 of my U.S. 7,107,235.  In addition, a more detailed discussion of this subject is provided below.

During the prosecution of U.S. patent application serial number 10/719,668, NIKE cited my U.S. 6,449,878, U.S. 6,601,042, and also publication US 2003/0069807A1 (corresponding to U.S. patent application serial number 10/279,626, now U.S. 7,107,235) in the IDS submitted to the USPTO on March 3, 2004.   However, I noticed NIKE's serial number 10/719,668, now U.S. 7,100,308, which had been published as U.S. 2005/0108897 on May 26, 2005, and then called you at NIKE's World Headquarters in Beaverton, Oregon and we met for lunch.  In the course of our conversation, I raised the issue of NIKE's patent application serial number 10/719,668, and then showed and discussed the most relevant figures and passages of my prior art patent applications.

Following my lunch meeting with you, my U.S. 2003/0051372 (serial number 10/152,402 corresponding to U.S. 7,016,867) was cited in the supplemental IDS filed on February 8, 2005.  Another supplemental IDS which cited U.S. 6,939,502 and D507,084 was later filed by NIKE on January 24, 2006.  Although I had directed your attention to specific passages and drawing figures in my pending patent applications, and the IDS forms which NIKE uses with the USPTO includes a space for providing such detailed information to the examiner, it appears from the record that NIKE did not specifically point out to the examiner the most relevant passages and drawing figures.  Given the fact that U.S. 7,107,235, e.g., contains 575 drawing figures, and the issued patent specification and claims encompass 214 written columns, without indicating to the examiner the most relevant portions of the document to consider, it would be understandable for any examiner handling the case to miss, e.g., Figures 73-76, 83-90, and Figures 247-249.

The patentable matter in U.S. 7,100,308 assigned to NIKE, relates to a "heel plate assembly." However, my prior patents and patent applications show in the drawing figures and discuss structures which are recited in the claims of U.S. 7,100,308. Further, it also appears from the record that NIKE did not correctly represent the substance of my patent applications and patents to the Examiner during the patent prosecution. In this regard, see the remarks submitted in response to the Office Action dated April 14, 2006 by NIKE's attorney of record, namely, Gregory J. Cohan, in the response dated on June 15, 2006. In contrast with the remarks made by NIKE's attorney of record in the aforementioned response, the fact is that my U.S. 6,449,878, U.S. 6,601,042, U.S. 7,016,867 and U.S. 7,107,235 do disclose, and I will here quote from the remarks of the NIKE attorney of record: "an article of footwear including an upper; and a sole structure secured to the upper, with the sole structure having an upper plate positioned adjacent the upper and extending longitudinally along at least a portion of the upper; and a heel plate assembly secured at one end thereof to the upper plate, the heel plate assembly extending downwardly from the upper plate such that the heel plate assembly forms an acute angle with the upper plate, a medial side of the heel plate assembly having a thickness greater than the thickness of a lateral side of the heel plate assembly, the entire heel plate assembly being formed of a single material, as required in independent claim 1."

In contrast with the representations made by NIKE, the specification of my U.S. 6,449,878, filed March 10, 2000, recites in several places that a spring element including superior spring element and inferior spring element portions can constitute a single part, e.g., see Column 4, Lines 36-49, and also the discussion of Figure 21 at Column 28, Lines 4-8. Further, my U.S. 7,107,235 includes many drawing Figures showing a spring element which is made to consist of a single component, e.g., Figure 1, and discussion thereof at Column 51, Lines 6-17, and also Figures 450-451, 453, 455-456, 464, 484-487, 569, as shown and discussed in the specification.

In addition, the specification of my U.S. 6,449,878 also discloses in several places that a spring element can have differential thickness and stiffness, and also recites that the medial side of the spring element can be made or caused to be thicker and stiffer than the lateral side: e.g., see Column 5, Lines 19-31, Column 13, Lines 30-59, Column 19, Lines 19-38,  Column 20, Lines 23-67 and continuing through Column 21, Lines 1-49, Column 23, Lines 38-67 and continuing through Column 24, Lines 1-42, and Column 29, Lines 27-60. In this regard, my U.S. patent application serial number 09/573,121, filed May 17, 2000, now U.S. 6,601,042, which includes Figures 1-44 also contains essentially the same drawing Figures and written disclosure.

Moreover, my U.S. 7,016,867 and U.S. 7,107,235 also show and recite a spring element having greater thickness and stiffness on the medial side relative to the lateral side. For example, see Figures 83-90 of U.S. 7,107,235 which

clearly show a spring element having greater thickness and stiffness on the medial side relative to the lateral side, as discussed in the specification at Column 104, Lines 10-67 and continuing through Column 105, Lines 1-24.  In particular, compare Figure 6 of NIKE's U.S. 7,100,308 with Figure 89 of my U.S. 7,107,235, and also see the discussion found in the specification of the latter patent at Column 105, Lines 4-12.  Figure 89 and the associated discussion contained in U.S. 7,107,235 is also present in my U.S. patent application serial number 10/152,402, filed May 21, 2002, now U.S. 7,016,867 which includes Figures 1-523; my U.S. provisional patent application serial number 60/360,784, filed March 1, 2002 which includes Figures 1- 500; my U.S. provisional patent application serial number 60/345,951, filed December 29, 2001 which includes Figures 1-360; and, my  provisional patent application serial number 60/292,644, filed on May 21, 2001 which includes Figures 1-253.  All of these patent applications were provided to NIKE on a non-confidential basis over a year before NIKE filed for U.S. patent application serial number 10/719,668 by Michael Aveni, now U.S. 7,100,308, and Aveni had been one of NIKE's contact persons with me in the previous year.

In my U.S. 6,449,878, a superior spring element positioned on the bottom of a shoe upper and which extends full length and has an inferior spring element affixed thereto is shown in Figure 17.  As shown in Figure 17, the spring element is exposed on its bottom surface and this is discussed at Column 23, Lines 28-37.  In this regard, my U.S. patent application serial number 09/573,121, filed May 17, 2000, now U.S. 6,601,042, includes Figures 1-44 and contains the same drawing figure and written disclosure.   Further, I showed NIKE research and development employees including Aveni more than one relevant footwear prototype having a spring element exposed on the bottom side of the shoe upper, and also several one-part spring elements in 2002.  In addition, NIKE research and development employees were shown nested spring element parts and were then told by me that the parts could be doubled-up.  NIKE research and development employees were also shown an early prototype spring element including two doubled-up members that I had made in 1999 using carbon fiber material.

Moreover, see the configuration of the "sole structure" shown in Figure 10, of NIKE's U.S. 7,100,308, and then compare it with Figures 247-249 of my U.S. 7,107,235 and relevant discussion in my specification at Column 127, Lines 1-20.  Further, see the structure shown in Figure 10 of NIKE's U.S. 7,100,308, and then compare it with, e.g., Figures 73-76 of my U.S. 7,107,235, and relevant discussion in my specification at Column 100, Lines 11-67 and continuing through to Column 102, Lines 1-36.  In brief, it appears that NIKE incorrectly represented the inventorship, failed to provide relevant prior art information in their possession, and also incorrectly represented the substance of my patent applications and issued patents in their remarks to the Examiner Marie D. Patterson during the prosecution of U.S. 7,100,308.

**9. NIKE FREE.**

For your information, I have a pair of NIKE FREE and the Lunar Racer and like running in the shoes.

NIKE has obtained several patents which relate to the NIKE Free product, e.g., U.S. 6,990,755, U.S. 7,171,767, U.S. 7,290,357, U.S. 7,392,605, and U.S. 7,607,241.   In this regard, NIKE is probably already done filing for this kind of structure, but for possible future reference some of the most relevant prior art includes U.S. 4,562,651 by Frederick et al. for "Sole With V-Orientated Flex Grooves," and in particular, U.S. 5,384,973 which is the "Sole With Articulated Forefoot" patent that I did while at NIKE, and also the "Athletic Shoe With Rearfoot Strike Zone" patents U.S. 5,425,184, U.S. 5,625,964, and U.S. 6,055,746.   For your information, copies of these NIKE patents have been attached.  Obviously, NIKE needs to cite its own most relevant prior art when filing patents.

Before I left regular employment at NIKE for a consulting relationship, I provided drawings showing the primary longitudinal groove disclosed in the "articulating forefoot" patent extending all the way back and joining the groove(s) shown the "rearfoot strike zone" patents to members of NIKE's design group.  In this regard, I was the sole or primary inventor on both of these patents, and why wouldn't someone want to combine both of these structures in a running shoe? However, I did not teach or advise making so many transverse grooves in the midfoot area as included in the NIKE FREE product because I was aware of the many patents to Frampton Ellis III and knew that he had licensed them to Adidas, and didn't want to steer NIKE into potential trouble.

For your information, I do not have copies of the drawings which may relate to the NIKE FREE that I shared with fellow NIKE employees when I worked as a regular employee in the patents department between 1990 -1996 because the work remained at NIKE.  However, I do have one drawing showing two longitudinal grooves intersecting two transverse grooves in the area of the forefoot and then extending rearward to intersect grooves associated with the "rearfoot strike zone" in a disclosure on "Adjustable Width and Footform" which is dated January 1, 1997 that I provided to NIKE during the time I worked as a consultant, and so will attach a copy here for your records.   As you can see, there is some resemblance to the NIKE FREE.   Again, when filing patents NIKE needs to cite its own most relevant prior art.  The problem of certain members of the design department suffering amnesia on the subject of inventorship is a different question and something for you to deal with internally.  Anyway, there is no issue to this point of this discussion of the NIKE FREE between NIKE and myself, but I think it would be prudent for you to cite the aforementioned patents on the IDS(s) regarding any similar NIKE patents in the future.

However, there is a different problem in the chain of patents associated with the NIKE FREE which does create a potential issue.  In brief, the first patent in the chain is U.S. 6,990,755, the next in a straight line was a Continuation which matured as U.S. 7,171,767, and the next in a straight line was also a Continuation which matured as U.S. 7,392,605.  The named inventors on these three patents were Tobie Hatfield, Eric Avar, Jeffry Pisciotta, James Meschter, Kevin Hoffer, Stann Sheperd, and Todd Waatti.  Aside for the IDS disclosure and possible inventorship issues discussed above, there are no other potential problems with these patents of which I am aware, but here is where two different streams get crossed and a problem arises.

NIKE filed a Continuation-in-part of the patent application which matured as U.S. 6,990,755, and this Continuation-in-part was granted as U.S. 7,290,357. In contrast with the seven aforementioned inventors on U.S. 6,990,755, the two named inventors on U.S. 7,290,357 are Steve McDonald and Tobie Hatfield. You may wish to notice that the "Related U.S. Application Data" published on the title page of U.S. 7,290,357 seems to indicate something that appears to be an impossibility and an error.  In any case, U.S. 7,290,357 does include matter contained in both U.S. 6,990,755 by the seven inventors named above, but also subject matter found in U.S. 7,415,557 by Steven McDonald and Bradley Long. Once again, see Paragraph 5 above regarding my discussion of U.S. 7,415, 557.

In brief, some of the subject matter contained in U.S. 7,415,557 by McDonald and Long, and then later in U.S. 7,290,357 and also U.S. 7,607,241 by McDonald and Hatfield is very similar to that contained in my prior patents.  For whatever reason, NIKE crossed the two streams represented by the NIKE FREE structure and the "removable outsole that can emerge through openings in the upper" structure, and then combined the two structures.  As a result, NIKE's U.S. 7,290,357 and U.S. 7,607,241 also include and reproduce some of the essential features taught in my prior patents, e.g., U.S. 7,107,235.

## 10. U.S. 6,925,732 by Richard Douglas Clarke, assigned to Nike, granted August 9, 2005.

Here's a head's up.  Make sure you have a look at U.S. 7,159,334 by Mathieu et al. which is assigned to Salomon before you commercialize a product.

U.S. 6,925,732 by Richard Douglas Clarke was filed on June 19, 2003 after NIKE had been provided with copies and examined both my issued and pending patent applications.  However, NIKE only cited my U.S. 6,449,878 in the IDS.  For reference purposes, see my U.S. 7,107,235, and in particular, Figures 23, 70, 195, 331, 333, 334, 361, 362, and 449.  Obviously, some of these figures may constitute relevant prior art.  In brief, it appears that NIKE did not provide some relevant prior art information to Examiner Marie D. Patterson during the prosecution of U.S. 6,925,732.

**11. U.S. 6,684,532 and U.S. 7,013,583 by Greene et al. for "Footwear With Removable Foot-Supporting Member.**

The first of the two NIKE patents was filed in November, 2001 and the second in December, 2003.  Here's a head's up regarding Claim 1 of NIKE's U.S. 7,013,583.  Some of the drawing figures in my patents show insoles having different relative thickness in the forefoot and rearfoot regions, e.g., see Figure 28 in my U.S. 6,449,878.  Also notice that the insoles shown in Figures 19 and 20 are different, and that the insole shown in Figure 20 is a bit thicker near the ball of the foot relative to the heel area.  In my U.S. 7,107,235, e.g., see also Figure 327 vs. Figure 328, Figure 336 vs. Figure 338, and Figures 469-473.

**12. U.S. 6,438,755 by Richard C. MacDonald and Edward L. Harber for "Aerodynamic Garment For Improved Athletic Performance And Method of Manufacture," assigned to Nike, filed September 15, 2000, and granted August 27, 2002.**

As you know, we met and talked about this patent several years ago, but I don't believe NIKE has yet taken appropriate steps to correct matters in the U.S. Patent Office.  Once again, here is some relevant information which relates to the NIKE patent.  As background and for reference purposes, see "Distance Running," ISBN 0-9724144-0-1, by Robert M. Lyden, Chapter 14, entitled "Aerodynamic Drag and Drafting," pages 354-365.  In particular, see the photos 14.3-14.4 of Chester Kyle on page 362, Figure 14.4 and related discussion on page 364, and the list of references on page 365.

NIKE contracted Chester Kyle and Len Brownlie as consultants to conduct R & D on the subject of aerodynamic apparel beginning in the late 1980's and continuing in the 1990's.  However, their published articles and research were not cited in the IDS provided to the Examiner in the NIKE patent.  For example, Brownlie's detailed Ph.D. thesis published in 1992 was not cited or provided to the USPTO.  Further, my paper entitled "Aerodynamic Apparel: Background for U.S. Patent Application, and/or Trademark Protection, publicly disclosed to NIKE in 1989, and which was the subject of a non-exclusive license to NIKE was not cited or provided to the USPTO.

For your information, my paper entitled "Aerodynamic Apparel: Background for U.S. Patent Application, and/or Trademark Protection" was included in a non-exclusive license to NIKE in connection with the efforts of former NIKE in-house patent attorney Tom Horgan and I to clean up the HUARACHE affair which had been created by Tinker Hatfield.  It was my idea to include the aerodynamic apparel disclosure and know how in the non-exclusive agreement.  The intention was to avoid an issue arising if NIKE would possibly commercialize like apparel products in the future.

However, NIKE's actions in later filing for a utility patent on such aerodynamic apparel, that is, something for which I had previously granted a non-exclusive license, was a legal contradiction and improper.  According to Kyle, my document entitled "Aerodynamic Apparel: Background for U.S. Patent Application, and/or Trademark Protection" was the first teaching of the "speedsuit" invention.  In the abstract, Kyle, Brownlie, and I should probably have also been named inventors, but I believe that the would-be patentable information was placed in the public domain before 1993, and so the question of inventorship is a moot point.  When I called and asked Kyle (530) 938-3127 whether he had raised the question of correct inventorship with a NIKE representative, he told me that "they said it would be best to have the named inventors be in-house."   As you know, that kind of thinking at NIKE is not proper, and so you need to work to correct it.

In brief, the would-be inventorship on the NIKE patent is not correct, and some or all of the subject matter included in the patent was placed in the public domain prior to the filing date.  Further, some of the would-have-been patentable matter and know how had been the subject of a non-exclusive license that I had granted to NIKE.   After the NIKE patent issued, I called and met with you and brought this matter to your attention.  You were given copies of my paper which had been provided to NIKE in 1989, and also Brownlie's Ph. D thesis published in 1992.  In view of the facts, I suggested that you take constructive action to place the NIKE patent in the public domain.  However, you expressed reluctance to do so, but instead suggested that NIKE never needed to litigate it.  Accordingly, the patent still stands as a "scarecrow" to others in the industry.  Once again, given the facts and circumstances associated with this subject I feel that it would be more appropriate for NIKE to take the necessary steps to put the patent in the public domain.

This concludes my discussion of the issues of which I am presently aware which relate to NIKE patents and my intellectual property.  Obviously, I was surprised by the content, and also the number of NIKE patents which are involved.  For your information, there are 12 subject headings and **27 NIKE patents discussed above** which include 36 named inventors.  Obviously, I have no control or input as to who is named as an inventor on NIKE patents and what subject matter is included and claimed in NIKE patents, or what relevant prior art is disclosed and cited during the prosecution of NIKE patents.

Accordingly, NIKE is entirely responsible for the present situation.   Not me.  So when you discuss this subject with Mark Parker make certain that you make clear to him that "we (NIKE) have met the enemy and it is us."

It's a tangled web…

Given the facts and present circumstances, I wish to make a few constructive suggestions and hope they will be well received.  NIKE needs to make a better effort to get the inventorship right on their patents.  The company also needs to do a better job in providing the U.S. Patent Office and patent examiners with relevant prior art which is known to their employees.  When attorneys who represent NIKE in the U.S. Patent and Trademark Office know where the most relevant drawing figures are in a large patent document, it would be best to indicate such in the available space provided on your IDS forms to the patent examiner.  It's a matter of professional courtesy, and it also constitutes equitable conduct.  Employees at NIKE need to be honest regarding inventorship.  Attorneys representing NIKE need to be sure of the facts and to accurately represent the matter disclosed in the patents of others when prosecuting NIKE patents.

Moreover, NIKE needs to mean what is says and to respect the work and rights of others.  It's wrong and also bad business for NIKE representatives to tell someone that the company has no interest in their patents, and for NIKE to then go out file over a dozen patents which are directed to essentially the same subject matter.  One of the simple rules we are all taught in Kindergarten: Play nice with the other kids.  NIKE may enjoy nearly 20 billion dollars in annual sales, but this does not mean the company is exempt from this golden rule.

Obviously, the facts indicate that NIKE **does** have an interest in my intellectual property.  There is an appropriate way for a company to express that interest.

In order for NIKE to win exclusive rights to the intellectual property that your company wishes to obtain I believe that it would be in the best interest of NIKE to purchase or license my intellectual property.

I will look forward to speaking with you.

Best Regards,

*Rob*

Robert M. Lyden

(971) 219-1200

14