# PATENT LICENSE AGREEMENT

THIS PATENT LICENSE AGREEMENT ("Agreement") is entered into as of _____ *01/17* _____, 2007 ("Effective Date") by and between Robert M. Lyden, an individual resident of the State of Oregon, with an address of 18261 S.W. Fallatin Loop, Aloha, OR 97007 ("Licensor") and DashAmerica, Inc. (d/b/a Pearl Izumi), a Colorado Corporation, located at 620 Compton Street, Broomfield, Colorado 80020 ("Licensee").

# RECITALS

WHEREAS, Licensor owns a portfolio of patent rights covering footwear, and the business method for making and selling component based footwear and covering customizable insoles and associated know how and trademarks; and

WHEREAS, Licensor desires to license his patent rights and know how in such technology and trademarks to Licensee on an exclusive basis, and Licensee desires to license such rights on an exclusive basis, subject to the terms and conditions of this Agreement; and

WHEREAS, Licensee is separately licensing a portfolio of patent rights covering spring soles, under a Patent License Agreement between Licensee and Rustem I. Gamow ("Gamow") and Hugh M. Herr ("Herr") of even date herewith ("Herr/Gamow License Agreement"), which patent rights may cover some of the products manufactured and distributed by Licensee under this Agreement; and

WHEREAS, for as long as both this Agreement and the Herr/Gamow License Agreement are in effect, Licensor, Gamow and Herr desire to treat their respective Footwear Patent Rights and Spring Sole Patent Rights as a pool for the purposes of determining royalties (including minimum commitments) due for sales of Shoes (but not Insoles) hereunder, and Licensee agrees to pay royalties on such basis pursuant to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises, mutual covenants and agreements hereinafter set forth, the parties hereby agree as follows:

## 1.    DEFINITIONS

Section 1.1    Affiliate. "Affiliate" means any entity which owns at least 50% of, is at least 50% owned by, or is under common (at least 50%) ownership with Nautilus, Inc. (except for Licensee).

Section 1.2    Apparel Patent Rights. "Apparel Patent Rights" means the patent rights to any of the subject matter claimed in or covered by any of the patents or patent applications identified in Exhibit A to this Agreement, and continuing applications thereof including divisions, substitutions and continuation-in-part applications; any patents issuing on said applications or continuing applications including reissues, re-examinations and extensions; and any corresponding foreign applications or patents.

Section 1.3    Cap. "Cap" has the meaning set forth in Section 4.2(k).

Section 1.4    Confidential Information. "Confidential Information" means all information that is disclosed by Licensee to Licensor or by Licensor to Licensee and that: (a) is

1

designated as confidential, regardless of the form in which it is disclosed; or (b) relates to a party's markets, customers, products, patents, trade secrets, inventions, procedures, methods, designs, strategies, plans, assets, liabilities, prices, costs, revenues, profits, organization, employees, agents, distributors, subdistributors or business in general. Notwithstanding anything to the contrary herein, the Know How and the unpublished Licensor's Improvements are the Confidential Information of Licensor and the unpublished Licensee's Improvements are the Confidential Information of Licensee. The unpublished Joint Improvements are the Confidential Information of each party.

Section 1.5    CPI. "CPI" means the percentage increase of the Consumer Price Index calculated by the U.S. government's Bureau of Labor Statistics for the relevant year.

Section 1.6    Direct Channels." Direct Channels" means the channels of distribution of Licensed Products comprised of sales by Licensee via telephone or the Internet direct to consumers arising from the marketing of Licensed Products in Infomercials or through the Internet, or via mailing or catalog sales direct to consumers.

Section 1.7    Distributor Channels. "Distributor Channels" means the channels of distribution of the Licensed Products comprised of sales by Licensee to third party distributors for onward resale, sales by Licensee to employees of Licensee or any of its affiliates, or sales by Licensee through promotional employee purchase, pro-purchase and any industry representative purchases.

Section 1.8    Footwear Patent Rights. "Footwear Patent Rights" means the patent rights to the subject matter claimed in or covered by any of the patents or patent applications identified as the Footwear Patent Rights in Exhibit B to this Agreement, and continuing applications thereof including divisions, substitutions and continuation-in-part applications; any patents issuing on said applications or continuing applications including reissues, re-examinations and extensions; and any corresponding foreign applications or patents, and any patent rights in the Licensor's Improvements and Licensor's interest in the Joint Improvements.

Section 1.9    Improvements. "Improvements" means any and all improvements or developments in connection with any of the subject matter described or claimed in the Patent Rights, Know How, or as a result of the licenses granted hereunder.

Section 1.10    Infomercial. "Infomercial" means a television commercial, or paid programming on television.

Section 1.11    Insole Patent Rights. "Insole Patent Rights" means the patent rights to the subject matter claimed in or covered by any of the patents or patent applications identified as the Insole Patent Rights in Exhibit B to this Agreement, and continuing applications thereof including divisions, substitutions and continuation-in-part applications; any patents issuing on said applications or continuing applications including reissues, re-examinations and extensions; and any corresponding foreign applications or patents, and any patent rights in the Licensor's Improvements and Licensor's interest in the Joint Improvements.

Section 1.12    Insoles. "Insoles" has the meaning set forth in Section 4.2(d).

Section 1.13    Joint Improvements. "Joint Improvements" has the meaning set forth in Section 3.1(d).

Section 1.14   Know How. "Know How" means the accumulation of skills, processes and experience pertaining to the Footwear Patent Rights, Insole Patent Rights and Spring Sole Patent Rights owned or controlled by Licensor, including, but not limited to, any and all technical information, discoveries, processes, procedures, methods, protocols, formulae, specifications, trade secrets, know how, test results, studies, analyses, raw material sources, data, formulation or production technology, and other information necessary or useful in the manufacture, sale and use of the Licensed Products, whether now or during the term of this Agreement, including any non-patent rights in the Licensor's Improvements and Licensor's interest in the Joint Improvements. During the Apparel Option Period (defined in Section 2.4), Know How also includes the accumulation of skills, processes and experience pertaining to the Apparel Patent Rights owned or controlled by Licensor during the Apparel Option Period.

Section 1.15   Licensed Product. "Licensed Product" means any and all products that employ or are produced by the practice of invention(s) defined in at least one Valid Patent Claim and/or that utilize the Know How.

Section 1.16   Licensee's Improvements. "Licensee's Improvements" has the meaning set forth in Section 3.1(c).

Section 1.17   Licensor's Improvements. "Licensor's Improvements" has the meaning set forth in Section 3.1(b).

Section 1.18   Minimum Commitment. "Minimum Commitment" means the minimum royalty amounts due under this Agreement in each year commencing on the first day of Phase II, which are calculated as the applicable Pool Percentage of the amounts specified in the table attached as Exhibit C, which may be modified pursuant to Section 4.3 from time to time.

Section 1.19   Net Revenue. "Net Revenue" means the total amounts in cash consideration paid to Licensee from each sublicense entered into by Licensee as permitted herein for license fees or running royalties less any required third party payments (such as commission to middlemen), and any taxes, duties, or similar governmental charge imposed by any jurisdiction or on account of any amounts required by the tax laws of any jurisdiction to be withheld from such total consideration and paid over to any taxing authority.

Section 1.20   Patent Rights. "Patent Rights" means the Footwear Patent Rights and Insole Patent Rights.

Section 1.21   Pool Percentage. From the Effective Date until the Pool Termination Date, the "Pool Percentage" is 70%. From the day after the Pool Termination Date until expiration or termination of this Agreement, the "Pool Percentage" is 100%.

Section 1.22   Pool Termination Date. "Pool Termination Date" means the date on which the Herr/Gamow License Agreement expires or is terminated.

Section 1.23   Shoes. "Shoes" has the meaning set forth in Section 4.2(a).

Section 1.24   Spring Sole Patent Rights. "Spring Sole Patent Rights" has the meaning set forth in the Herr/Gamow License Agreement, and includes the patent rights to any of the subject matter claimed in or covered by any of the patents identified as the Spring Sole Patent Rights in Exhibit F to this Agreement, and about which Licensor has Know How.

3

Section 1.25   Trademarks. "Trademarks" means Licensor's trademarks described in Exhibit D to this Agreement, as may be amended from time to time upon mutual agreement of the parties

Section 1.26   Valid Patent Claim.  "Valid Patent Claim" means a claim of an issued and unexpired patent in the Patent Rights, which has not been revoked or held unenforceable or invalid by a final decision of a court or other governmental agency of competent jurisdiction having authority over said patent and that final decision is not appealed or unappealable.   All claims are considered Valid Patent Claims (a) until so adjudicated and (b) during prosecution of a patent application containing such claims.

Section 1.27   Wholesale Channels. "Wholesale Channels" means any channels of distribution of the Licensed Products by Licensee other than the Direct Channels or Distributor Channels.

## 2.   EXCLUSIVE LICENSES; TRADEMARK USE

Section 2.1   Exclusive Patent Right and Know How License. Licensor hereby grants to Licensee, and Licensee hereby accepts from Licensor, an exclusive, sublicensable, worldwide license, under the Patent Rights and Know How, to make, have made, use, offer for sale, sell, import and export Licensed Products.

Section 2.2   Exclusive Trademark License.

(a)   Subject to Section 2.2(b), Licensor hereby grants to Licensee, and Licensee hereby accepts from Licensor, an exclusive, sublicensable, worldwide, royalty-free, fully paid up license to use the Trademarks on Licensed Products. Notwithstanding the foregoing, Licensee shall be under no obligation to use the Trademarks on the Licensed Products.

(b)   Notwithstanding the royalty-free status of the license to the Trademarks hereunder, if Licensee's obligation to pay royalties hereunder ceases because all of the patents or any claim thereof included within the Patent Rights are held invalid in all countries and the Herr/Gamow License Agreement has expired or been terminated the parties shall negotiate in good faith a royalty for continued use of the Trademarks licensed hereunder.

Section 2.3   Packaging/Advertising.  On request by Licensor, Licensee shall immediately deliver to Licensor a true and accurate sample of any packaging and any advertising of the Licensed Products bearing Trademarks proposed by Licensee. If Licensor disapproves of such packaging or advertising prior to use of the same commercially, Licensor shall communicate in writing the reasonable reasons for his disapproval to Licensee, and Licensee shall revise the applicable packaging and/or advertising to conform to Licensor's reasonable requirements within the reasonable timeframe requested by Licensor (which shall not include recalling merchandise with the revised packaging or advertising but putting in place the revised packaging and advertising for the next product shipment where such change is reasonably made). Notwithstanding the foregoing, Licensor agrees that the sole purpose of this Section 2.3 is to ensure quality control as is necessary to protect from loss of Licensor's trademark rights in the Trademarks. As such, Licensor agrees that he shall perform sampling on a statistical basis agreed upon by the parties that is sufficient to protect Licensor's worldwide trademark rights but does not unduly interfere with Licensee's business operations.

4

Section 2.4    Option for Apparel Patent Rights. For the period beginning on the Effective Date and ending six (6) months later ("Apparel Option Period"), Licensee shall have an option to license or purchase the Apparel Patent Rights from Licensor.  Licensor agrees that he will not grant licenses to, or offer for sale, the Apparel Patent Rights to any third party during the Apparel Option Period, and that he will negotiate in good faith with Licensee regarding the license or purchase of the Apparel Patent Rights by Licensee during the Apparel Option Period. On agreement to the license or purchase of the Apparel Patent Rights by Licensee, if at all, the parties shall document the rights and obligations pertaining thereto in a separate written agreement, or an amendment to this Agreement, as appropriate.

## 3.    DELIVERY; PHASES

Section 3.1    Delivery; Ownership.

(a)    Within 10 days of the Effective Date, Licensor agrees to make available and disclose to Licensee all Know How in Licensor's possession, custody or control.

(b)    Licensor shall promptly disclose, in writing, to Licensee all Improvements developed, conceived or reduced to practice during the term of this Agreement solely by Licensor ("Licensor's Improvements").  Licensor shall own all right title and interest in and to Licensor's Improvements, subject to the license set forth herein.

(c)    Licensee shall own all right title and interest in and to all Improvements developed, conceived or reduced to practice during the term of this Agreement solely by Licensee ("Licensee's Improvements"), subject to the terms of Section 3.2(f). If Licensee files any patent application covering any of Licensee's Improvements, Licensee shall deliver to Licensor written notice identifying the Licensee's Improvements so covered.

(d)    The parties shall own an undivided interest in any Improvements developed, conceived or reduced to practice jointly by the parties ("Joint Improvements"), subject to the license granted herein and subject further to the terms of Section 3.2(f).

(e)    The license set forth in Section 2.1 shall be deemed to include an exclusive license to use all of Licensor's Improvements and all of Licensor's rights in the Joint Improvements during the term of this Agreement for the purposes set forth in Section 2.1.

(f)    Each party agrees to execute and deliver without further consideration any further licenses, assignments or other documents, and to perform such other lawful acts as the other party may reasonably request, to fully secure and/or evidence the rights or interests in this Section 3.1.

Section 3.2    Phase I.

(a)    The first phase of this Agreement shall commence on the Effective Date and end six months later unless extended pursuant to subsection (d) below or earlier terminated ("Phase I").

(b)    During Phase I of this Agreement, Licensee shall diligently proceed with an evaluation of the Patent Rights and Know How to determine whether, as determined by Licensee in its sole discretion, the manufacture, promotion and sale of Licensed

Products under the Patent Rights and Know How is technically or legally feasible or commercially viable for, or of interest to, Licensee.

(c)     During Phase I, Licensor shall provide up to forty (40) days (excluding travel time) of assistance for no charge to Licensee, at Licensee's request, in order to assist Licensee to understand the Patent Rights and Know How. If Licensee requests Licensor to perform any additional services for Licensee during Phase I for the purposes set forth in this subsection, Licensee shall make such request in writing to Licensor, and Licensor shall perform such services for the fee of $250 per day.

(d)     Licensee may extend Phase I in one month increments for up to three additional months with written notice to Licensor prior to expiration of the then-current term of Phase I.

(e)     Licensee may terminate this Agreement at any time during Phase I for any reason or no reason at all, by delivering Licensor written notice to that effect prior to expiration of Phase I (as extended). Termination shall be effective on the date of delivery of such notice. Any such notice shall include, for informational purposes only, an explanation of why Licensee is terminating this Agreement. Nothing in the preceding sentence shall affect Licensee's discretionary right to terminate under this Section 3.2(e).

(f)     If Licensee terminates this Agreement pursuant to Section 3.2(e) all of Licensee's rights in any Licensee's Improvements and Joint Improvements, in each case as developed during Phase I, shall be deemed assigned to Licensor as of the effective date of such termination on as AS IS basis.

Section 3.3     Phase II.

(a)     Unless this Agreement is terminated during Phase I, the second phase of this Agreement shall commence on expiration of Phase I and shall extend for a period of five years unless earlier terminated ("Phase II"). Thereafter, if not earlier terminated, this Agreement shall continue until the expiration or termination of this Agreement.

(b)     During Phase II of this Agreement, Licensee shall diligently proceed with the manufacture, promotion and sale of Shoes and Insoles and shall earnestly and diligently endeavor to market the same within a reasonable time after the start of Phase II. Licensee shall exercise prudent and reasonable business judgment in meeting its due diligence obligations hereunder. Notwithstanding the foregoing, Licensor acknowledges that there will be a ramp up period for all Licensed Products, and that Licensee shall not be obligated to pursue the commercialization of Insoles for the first three years under this Agreement.

(c)     During Phase II, Licensor shall provide up to thirty (30) days (including travel time) of assistance to Licensee per year for no charge, at Licensee's request, in order to assist Licensee to understand the Patent Rights and Know How and for additional development services. If Licensee requests Licensor to perform any additional services for Licensee during Phase II for the purposes set forth in this subsection, Licensee shall make such request in writing to Licensor, and Licensor shall perform such services for the fee of $250 per day.

(d)    At the end of Phase II, the parties shall meet for a business summary review and related discussions regarding the use and status of the Patent Rights and Know How. Such meeting shall be for informational purposes only.

Section 3.4    Buy-Out Option.

(a)    For the period beginning on the Effective Date and ending two (2) years after the first pair of Shoes are sold commercially under this Agreement or the Herr/Gamow License Agreement (which shall be determined based on whether royalties are due for such sale) ("Buy-Out Option Period"), Licensee shall have the option, in its sole discretion, to purchase all of Licensor's right, title and interest in and to the Patent Rights, Know How and Trademarks (including without limitation Licensor's Improvements, Licensor's interest in the Joint Improvements, and the Apparel Patent Rights to the extent the option set forth in Section 2.4 has been exercised by Licensee).

(b)    Licensee may exercise the option described in Section 3.4(a) by delivering to Licensor written notice stating its desire to exercise the option during the Buy-Out Option Period.  Upon receipt of such notice by Licensor:

(i) Licensor shall be deemed to have assigned, transferred and sold to Licensee, and as of such date does hereby assign, transfer and sell to Licensee, all of Licensor's right, title and interest in and to the Patent Rights, Know How and Trademarks (including without limitation Licensor's Improvements, Licensor's interest in the Joint Improvements, and the Apparel Patent Rights to the extent the option set forth in Section 2.4 has been exercised by Licensee); and

(ii) the parties shall negotiate in good faith a purchase agreement covering the payment of the purchase price for the assignment, and other customary terms for such assignment, transfer and sale, such as, without limitation, representations and warranties (subject to subsection (c) below).

(c)    The purchase price for the purchase of all of Licensor's right, title and interest in and to the Patent Rights, Know How and Trademarks (including without limitation Licensor's Improvements, Licensor's interest in the Joint Improvements, and the Apparel Patent Rights to the extent the option set forth in Section 2.4 has been exercised by Licensee) shall be Seven Million United States Dollars (US$7,000,000), payable over a one year period from execution of the purchase agreement structured with a 30% upfront payment due as of execution of the purchase agreement.

(d)    If a mutually agreeable purchase agreement is not executed by the parties within sixty (60) days of receipt by Licensor of Licensee's written notice to exercise its option, then Licensee reserves the right to revoke its offer to purchase all of Licensor's right, title and interest in and to the Patent Rights, Know How and Trademarks (including without limitation Licensor's Improvements, Licensor's interest in the Joint Improvements, and the Apparel Patent Rights to the extent the option set forth in Section 2.4 has been exercised by Licensee), reverse the assignment set forth in subsection (b)(i) above, and may terminate this Agreement with written notice to Licensor.

(e)    On the closing of the transactions contemplated by a purchase agreement for the purchase by Licensee of all of Licensor's right, title and interest in and to the Patent Rights, Know How and Trademarks (including without limitation Licensor's

7

Improvements, Licensor's interest in the Joint Improvements, and the Apparel Patent Rights to the extent the option set forth in Section 2.4 has been exercised by Licensee), this Agreement shall automatically terminate without any action on the part of either party.

(f)     If Licensee exercises the option described in Section 3.4(a), then Licensee shall also exercise the buy-out option under the Herr/Gamow License Agreement.

## 4.    PRICE AND PAYMENT

Section 4.1    Advance. Licensee shall pay Licensor a royalty advance in accordance with the following schedule:

(a)     on execution of this Agreement, Licensee guarantees that Licensee shall pay Licensor the sum of US$50,000;

(b)     on or before February 15, 2007, Licensee guarantees that Licensee shall pay Licensor the sum of US$50,000;

(c)     on or before May 30, 2007, Licensee shall pay Licensor the sum of US$50,000; and

(d)     if Licensee has not terminated the Agreement by the last day of Phase I (as extended), within ten (10) days of the expiration, including any extension, of Phase I, Licensee shall pay Licensor the sum of US$50,000.

If Licensee extends Phase I pursuant to the terms of Section 3.2(d), then on the first day of each such extension period during Phase I, Licensee shall pay Licensor the additional sum of US$25,000. If Licensee terminates this Agreement pursuant to the terms of Section 3.2(e) or 10.2(e) or the Agreement is otherwise terminated, then Licensee shall not be obligated to make any of the additional advanced payments falling after the effective date of termination except that Licensee shall be obligated to make the payments due under Section 4.1(a) and (b) unless Licensee terminates under Section 10.2(b) or (d).

Section 4.2    Royalty. Subject to the terms and conditions of this Agreement, Licensee shall pay Licensor royalties on specified Licensed Products only, as follows:

(a)     for the first 1,000,000 pairs of shoes which are Licensed Products covered by the Footwear Patent Rights or Spring Sole Patent Rights ("Shoes") that are sold by Licensee, Licensee shall pay Licensor the applicable Pool Percentage of $1 per pair of Shoes sold through Wholesale Channels, US$1.50 per pair of Shoes sold through Direct Channels and $0.50 per pair of Shoes sold through Distributor Channels;

(b)     for the next 1,000,000 pairs of Shoes that are sold by Licensee in excess of the Shoes sold under subsection (a), Licensee shall pay Licensor the applicable Pool Percentage of US$0.75 per pair of Shoes sold through Wholesale Channels, US$1.25 per pair of Shoes sold through Direct Channels, and US$0.375 per pair of Shoes sold through Distributor Channels;

(c)     for any pairs of Shoes that are sold by Licensee in excess of the Shoes sold under subsection (b), Licensee shall pay Licensor the applicable Pool Percentage of US$0.50 per pair of Shoes sold through Wholesale Channels, US$1 per pair of Shoes

sold through Direct Channels, and US$0.25 per pair of Shoes sold through Distributor Channels;

(d)     for each pair of insoles which are Licensed Products covered solely by the Insole Patent Rights ("Insoles") that are sold by Licensee under this Agreement, Licensee shall pay Licensor US$0.25 per pair of Insoles sold through Wholesale Channels, US$0.30 per pair of Insoles sold through Direct Channels, and US$0.075 per pair of Insoles that are sold through Distributor Channels;

(e)     no royalty payments shall be due for Shoes or Insoles which are sold and returned as defective, unusable, rejected by a purchaser or for which Licensee receives no payment, and to the extent royalties have already been paid prior to such circumstances being made apparent, Licensee may credit such amounts previously paid against future royalties due;

(f)     notwithstanding anything to the contrary herein, royalties shall only be due and payable on Shoes or Insoles covered by a Valid Patent Claim (where, in the case of Shoes covered by Spring Sole Patent Right, "Valid Patent Claim" is as defined in the Herr/Gamow License Agreement) in the country in which the Shoes or Insoles are sold, provided, however, there shall only be a single payment of royalties at the amounts set forth in this Section 4.2 to Licensor payable on any such sale of Shoes or Insoles, regardless of the number of patent applications or patents which be involved;

(g)     there shall only be a single payment of royalties to Licensor at the amounts set forth in this Section 4.2 for the Shoes sold through the applicable channel of distribution payable on any sale of Shoes containing Insoles or to contain Insoles in a single sale;

(h)     no royalty payments shall be due for Shoes or Insoles which are used or provided to others by Licensee or a sublicensee solely for promotion, research, demonstration, evaluation, testing or training purposes and for which no income is received;

(i)     Shoes or Insoles shall be considered "sold" when Licensee invoices the applicable channel of distribution for the sale;

(j)     Licensee may reduce the royalties due hereunder by 10% each quarter to reflect the advance paid by Licensee under Section 4.1, until the advance has been fully credited, but no such reduction shall affect the Minimum Commitment due hereunder;

(k)     the maximum amount of royalties to be paid under this Agreement and the Herr/Gamow License Agreement is Twenty Million United States Dollars (US$20,000,000) (the "Cap"), Licensor shall be due no more royalties by Licensee when the Cap is reached, and Licensee's license to the Patent Rights shall be deemed fully paid up as of the date on which Licensee has paid to Licensor under this Agreement and/or Gamow and Herr under the Herr/Gamow License Agreement cumulative royalties amounting to the Cap. Licensee's license to the Know How is deemed fully paid up as of the date on which the last of the advances are paid under Section 4.1; and

(l)     for clarity, if Licensee sells no Licensed Products that come within the definitions of "Shoes" or "Insoles" then, except for the Minimum Commitment and advances, no royalties shall be due hereunder.

Section 4.3    Minimum Commitment.

(a)    Licensee shall pay the applicable Minimum Commitment due in each year until expiration or termination of this Agreement, subject to the terms of this Section 4.3. If Licensee fails to pay to Licensor the applicable Minimum Commitment due in each year, as modified pursuant to subsection (b) below, through royalty payments, Licensee reserves the right to pay any deficiency between actual royalties paid (excluding the advance) and such Minimum Commitment to meet the applicable Minimum Commitment within forty-five (45) days of the end of each year in which the applicable Minimum Commitment is due. As Licensor's sole remedy and Licensee's exclusive liability for a failure by Licensee to pay the Minimum Commitment in any year when it is due (including the payment period specified above), Licensor may convert the exclusive license granted in Section 2.1 to a non-exclusive license by delivering written notice to that effect to Licensee. Notwithstanding the foregoing, in the event any of the patents in the Patent Rights or Spring Sole Patent Rights are invalidated, the parties may renegotiate in good faith a reduction to the Minimum Commitment and amend Exhibit C accordingly upon mutual agreement.

(b)    Commencing on the seventh anniversary of the start of Phase II, and every two years thereafter (ninth anniversary, eleventh anniversary, etc.), the Minimum Commitment base amount set forth in Exhibit C (as increased under this subsection (b)) due for the next two years under this Agreement shall be increased by the percentage increase in CPI applicable on the date of each such anniversary (for clarity, not the cumulative prior two years worth of CPI). The foregoing pattern of increases shall continue until the earlier of (i) expiration or termination of this Agreement; (ii) the date on which all of the Patent Rights and Spring Sole Patent Rights are invalidated or expire under this Agreement; and (iii) the date on which the Cap is reached.

Section 4.4    Sublicenses. If Licensee sublicenses the Patent Rights and Know How to Nautilus, Inc. or any of its Affiliates, then all Shoes and Insoles that are sold by Nautilus, Inc. or any of its Affiliates shall be subject to the royalty rates and terms set forth in Section 4.2. If Licensee sublicenses the Patent Rights and Know How to any other third parties, Licensee shall pay to Licensor the applicable Pool Percentage of 50% of the Net Revenues received from any such sublicensing, instead of the amounts set forth in Section 4.2 for sales of Shoes and Insoles by the sublicensee.

Section 4.5    Royalty Payment Schedule.    Within 45 days after the end of each quarter commencing at the start of Phase II, Licensee shall deliver to Licensor a report, which shall include at least (a) the quantities of Shoes and Insoles for which royalties are due hereunder that it has sold in the preceding quarter (or part thereof); (b) amounts received from any sublicenses under Section 4.4; (c) the calculation in U.S. Dollars of royalty payments payable hereunder with respect to such sales and sublicenses; and (d) the total due hereunder for such quarter, including deduction for setting off the royalty advance and for any returns, rejections or bad debt. Simultaneously with the delivery of each such report, Licensee shall pay to Licensor the lesser of (i) the royalty payments due for the quarter, and (ii) one quarter of the applicable Minimum Commitment due, in United States dollars. Within 45 days of the end of each year (measured from the start of Phase II and each anniversary thereafter), Licensee shall pay to Licensor any remaining royalty payments due for the prior year.

10

Section 4.6    Audits.    Licensee agrees to keep, for a minimum of one year after the transactions recorded therein, full and accurate books of account, records, data and memoranda respecting the manufacture and sales by Licensee of the Shoes and Insoles, and Net Revenues, in sufficient detail to enable the payments hereunder to Licensor to be determined.    Licensor may, at his own expense, examine said books and records on prior written notice of at least ten (10) business days, insofar as they concern the Shoes and Insoles and Net Revenues, and the royalty payments due hereunder and not more often than once in any calendar year, for the purpose of verifying the reports provided for in this Agreement and payments made in relation thereto.    If an error in royalties of more than 10% in Licensee's favor of the total royalties due for the entire audit period is discovered, then the reasonable out of pocket fees and expenses of such examination shall be paid by Licensee.    In the event that Licensor examines the records, documents and materials in the possession or under the control of Licensee with respect to the subject matter, such examination may be conducted by a third party selected by Licensor and shall be conducted in such manner as to not unduly interfere with the business of Licensee.    All information received or examined during such examination shall be deemed Licensee's Confidential Information.    Adjustment shall be made promptly by the proper party to compensate the other party for any errors or omissions disclosed by such audit.

Section 4.7    Services Fees.    Upon performance of the applicable services by Licensor for which additional fees are due hereunder, Licensor will invoice Licensee for such fees. Licensee will pay such invoices within thirty (30) days of the invoice date, by check or wire transfer to an account designated by Licensor.

Section 4.8    Governmental Filings.    Except for taxes based on Licensee's income, Licensor will be solely responsible for determining if any tax on payments made to Licensor hereunder is owed to any governmental authorities and shall pay any such tax and be responsible for all filings with appropriate governmental authorities.

Section 4.9    Reduced Royalty Rate.    If any patent or any claim thereof included within the Patent Rights within a country shall be held invalid in a final decision by a court of competent jurisdiction and last resort or if the local patent authority within such country determines that no patent may issue in a final decision from which no appeal has or can be taken and hence there is no Valid Patent Claim in such country, Licensee's obligation to pay royalties based on such patent or claim shall end as of the date of such final decision.    However, Licensee shall not be relieved from paying any royalties that accrued in such country before the effective date of such decision.

## 5.    WARRANTIES

Section 5.1    Licensor's Warranties.    Licensor represents and warrants that (a) he is the owner of the entire right, title and interest in and to the Footwear Patent Rights, Insole Patent Rights, Apparel Patent Rights, and Know How, free and clear of any liens, encumbrances, mortgages, pledges, assignments for security, conditional sales, or other title retention agreements, leases, charges, security interests, or other interest or claim of any kind or character, and free from the rightful claim of any third party; (b) he has not assigned and/or granted licenses, and shall not assign and/or grant licenses, to the Footwear Patent Rights, Insole Patent Rights, Apparel Patent Rights and Know How to any other person or entity that would restrict or impair the rights granted hereunder; (c) he shall not invoke any dominant patent or patent application owned or controlled by, or licensed to, Licensor to in any way restrict the rights

11

and/or licenses granted to Licensee under this Agreement; (d) he shall not take any actions that would result in or omit to act resulting in the termination of any of the rights granted to Licensee under this Agreement; (e) to his knowledge after reasonable investigation, the Footwear Patent Rights, Insole Patent Rights and Know How are valid and enforceable; (f) to his knowledge after reasonable investigation, the Footwear Patent Rights, Insole Patent Rights and Know How do not infringe the intellectual property rights of any third party, Licensor has received no notice that the Footwear Patent Rights, Insole Patent Rights or Know How infringe the intellectual property rights of any third party and Licensor does not reasonably believe that any such notice is forthcoming; (g) except as set forth in Exhibit E, to his knowledge, no third party has infringed the Footwear Patent Rights, Insole Patent Rights and Know How; (h) he has not received any notice from any person or entity claiming to have any right, title or interest in or to the Footwear Patent Rights, Insole Patent Rights, Apparel Patent Rights and Know How and that Licensor does not reasonably believe that any such notice is forthcoming; and (i) as of the Effective Date, except for the Footwear Patent Rights, Insole Patent Rights and the Spring Sole Patent Rights, there are no more issued patents and no filed patent applications that are necessary or useful to make, have made, use, sell, offer for sale, import and export component based footwear, customizable in-soles or spring soles that are owned, controlled or licensable by Licensor.

Section 5.2    Execution, Delivery; Valid and Binding Agreement.   Licensor represents and warrants that other than the execution, delivery and performance of this Agreement by Licensor, no proceedings on his part are necessary to authorize the execution, delivery and performance of this Agreement.   This Agreement has been duly executed and delivered by Licensor and constitutes the valid and binding obligation of Licensor, enforceable in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights or by general principles of equity.

Section 5.3    Authority; No Breach.   Licensor represents and warrants that the execution, delivery and performance of this Agreement by Licensor and the consummation of the transactions contemplated hereby do not conflict with, result in any breach of any of the provisions of, constitute a default under, result in a violation of, or result in the creation of a right of termination or acceleration or any lien, security interest, charge or authorization, consent, approval, exemption or other action by or notice to any court or other governmental body under, any indenture, mortgage, lease, loan agreement or other agreement or instrument by which Licensor is bound or affected, or any law, statute, rule or regulation or order, judgment or decree to which Licensor is subject.   No consent, approval or authorization of any governmental or regulatory authority is required to be obtained by Licensor in connection with his execution, delivery and performance of this Agreement.

## 6.    PROSECUTION; MARKING

Section 6.1    Notice.   Licensor shall promptly notify Licensee in writing of the issuance of any patent in the Patent Rights.

Section 6.2    Prosecution.   Licensor shall diligently prosecute and maintain the Patent Rights and Trademarks using counsel of his choice, which counsel shall also be subject to the reasonable approval of Licensee.   Licensee and Licensor shall consult in good faith with each other prior to any filings or other actions before the U.S. Patent and Trademark Office with respect to the Patent Rights and Trademarks, including without limitation any continuations, and

the parties shall jointly make all decisions pertaining thereto. Licensee may request Licensor to obtain patent or trademark protection in foreign countries if available and, if so requested, Licensor shall cooperate and diligently file, prosecute and maintain such rights using counsel of his choice in such foreign countries. Upon request, Licensor shall promptly provide Licensee and its counsel with copies of all relevant documentation so that Licensee may be informed and apprised of the continuing prosecution of the Patent Rights and Trademarks. If Licensor ceases to perform in accordance with this section or if Licensor decides to abandon the Patent Rights or Trademarks, or any of them, (and Licensor shall notify Licensee of any such decision at least ten (10) prior to abandonment becoming effective), Licensor agrees that Licensee may take over the prosecution and maintenance of the applicable Patent Rights and Trademarks.

Section 6.3    Patent Costs.  For so long as the applicable licenses set forth herein are exclusive, Licensee shall pay all the costs of preparing, filing, prosecuting, and maintaining the Patent Rights and Trademarks, provided that Licensee may deduct 50% of all such costs from royalties due hereunder but no such reduction shall affect the Minimum Commitment due hereunder.

Section 6.4    Patent Marking.  Licensee shall mark all Licensed Products made, used, or sold under the terms of this Agreement in accordance with 35 U.S.C. § 287(a) or any other successor statute in the United States and the applicable patent marking laws of any other country in which Licensed Products are sold.  Licensee shall ensure that any sublicensee authorized under this Agreement shall also mark its Licensed Products accordingly.

## 7.    ENFORCEMENT

Section 7.1    Notice of Infringement.   If Licensor learns of the likely infringement or misappropriation of any of the Patent Rights, Know How or Trademarks under this Agreement, Licensor shall give written notice thereof to Licensee and shall provide Licensee with reasonable evidence of such infringement or misappropriation.

Section 7.2    Pre-Issuance. Where the suspected or actual infringement or other suspected or actual unauthorized use of the Patent Rights relates to the claims in a patent application in the Patent Rights for which no patent has yet been issued, Licensor shall promptly give notice to the third-party infringer of the publication of the patent application.

Section 7.3    Infringement by Third Parties.

(a)    Licensee may, but shall be under no obligation to, take any action to enforce any suspected or actual infringement or other unauthorized use of the Patent Rights, Know How and Trademarks. If Licensee enforces any such action, Licensor may elect to join as a party in that action at Licensor's expense, provided that if Licensee does not have standing without Licensor joining the action, Licensor shall join the action at Licensee's expense.

(b)    If Licensee fails to commence enforcement of such action within ninety (90) days following the earlier of (a) Licensee becoming aware of such action; or (b) written request by Licensor for Licensee to do so, then Licensor may, but shall be under no obligation to, in his own name, and at his own cost, enforce any action Licensor deems necessary.  If Licensor enforces any such action and Licensor requests Licensee to join as a party to that action, Licensee shall join as a party to that action at Licensor's expense.

(c)    If Licensee enforces or controls any such action, Licensee shall have the exclusive right to employ counsel of its own selection and to direct and control the litigation or any settlement thereof; provided that Licensee shall not take any actions that result in the devaluation of the Patent Rights, Know How or Trademarks for Licensor and Licensee shall not settle any such actions in any way that would minimize or damage Licensor's rights in the Patent Rights, Know How or Trademarks. If Licensee enforces any such action, Licensee shall be entitled to reimburse itself first out of any sums recovered in such suit or in settlement thereof for all costs and expenses, including reasonable attorneys' fees, necessarily involved in the prosecution of such suit, and for any losses incurred by Licensee; and the parties shall split any remaining sums in accordance with the following percentages: 75% to Licensee and 25% to Licensor.

(d)    If Licensor enforces any such action, Licensor shall have the exclusive right to employ counsel of his own selection and to direct and control the litigation or any settlement thereof; provided that Licensor shall not take any actions that result in the devaluation of the Patent Rights, Know How or Trademarks for Licensee and Licensor shall not settle any such actions in any way that would minimize or damage Licensee's rights hereunder. If Licensor enforces any such action, Licensor shall be entitled to reimburse himself first out of any sums recovered in such suit or in settlement thereof for all costs and expenses, including reasonable attorneys' fees, necessarily involved in the prosecution of such suit, and for any losses incurred by Licensor, and the parties shall split any remaining sums in accordance with the following percentages: 75% to Licensee and 25% to Licensor. Notwithstanding the foregoing, on request by Licensee, Licensor shall submit each stage of Licensor's action to Licensee for review and approval, and Licensee shall have the right at any time with written notice to Licensor to take control of any such action. Licensor may not settle or compromise any such action without the prior written consent of Licensee, which consent shall not be unreasonably withheld.

(e)    In any suit or dispute involving any third-party infringer, the parties shall cooperate fully, and upon the request of the enforcing party, the non-enforcing party shall make available to the enforcing party all relevant records, papers, information, samples, specimens, and the like which may be relevant and in its possession.

## 8.    INFRINGEMENT; LIMITATION OF LIABILITY

Section 8.1    Third-Party Claims for Infringement.    In the event that any third-party files an action or makes a claim against either party which claim alleges that a Licensed Product covered by the Patent Rights or Know How or other use of the Patent Rights, Know How or Trademarks as permitted hereunder infringes the third-party's intellectual property rights or other proprietary rights, and such claim pertains to the Patent Rights or Know How, then Licensee and Licensor shall negotiate in good faith their respective obligations regarding the defense and/or settlement of such claim. During any period commencing on alleged infringement (except with respect to the Trademarks) and ending on resolution of the particular infringement or claim (and without limiting the terms of Section 8.2), Licensee's obligation to pay royalties in each year shall be reduced as follows: (a) if sales of Licensed Products are such that the royalties due to Licensor based on Licensed Products sold are less than the Minimum Commitment due (calculated quarterly) in the year such claim is made, or in any year during which such a claim is outstanding, then Licensee's obligation to pay royalties in each year during which such a claim is outstanding shall be reduced to 50% of the Minimum Commitment due hereunder (for example,

if the royalties due in the year are $200,000, and the Minimum Commitment in such year is $245,000, then Licensee's obligation to pay royalties in such year during an outstanding claim shall be reduced to $122,500); or (b) if sales of Licensed Products are such that the royalties due to Licensor based on Licensed Products sold are more than the Minimum Commitment due (calculated quarterly) in the year such claim is made, or in any year during which such a claim is outstanding, then Licensee's obligation to pay royalties in each year during which such a claim is outstanding shall be reduced by the higher of (i) the amount which is 50% of the Minimum Commitment due in the applicable year, and (ii) 50% of the royalties due above the Minimum Commitment due hereunder (for example, (1) if the royalties due in the year are $300,000, and the Minimum Commitment in such year is $245,000, then Licensee's obligation to pay royalties in such year during an outstanding claim shall be reduced by $122,500, which is the higher of $122,500 and $27,500, and (2) if the royalties due in the year are $800,000, and the Minimum Commitment in such year is $245,000, then Licensee's obligation to pay royalties in such year during an outstanding claim shall be reduced by $277,500, which is the higher of $122,500 and $277,500.)

   Section 8.2    Offset. Notwithstanding anything to the contrary herein, but subject to this Section 8.2, Licensee may use any or all of the royalty amounts due hereunder (a) to offset any and all settlement or judgment amounts, losses, liabilities, damages or expenses (including reasonable legal fees and expenses) paid or payable by Licensee as a result of any third-party action or claim that alleges that a Licensed Product covered by the Patent Rights or Know How or other use of the Patent Rights or Know How as permitted hereunder infringes the third-party's intellectual property rights or other proprietary rights; (b) to pay for any costs and expenses incurred in defending any third-party action or claim that alleges that a Licensed Product covered by the Patent Rights or Know How or other use of the Patent Rights or Know How as permitted hereunder infringes the third-party's intellectual property rights or other proprietary rights, which costs and expenses are not covered by the reduction in royalties due set forth in Section 8.1; and (c) to offset any and all settlement or judgment amounts, losses, liabilities, damages or expenses (including reasonable legal fees and expenses) paid or payable by Licensee as a result of any third-party action or claim arising from (i) the negligence, recklessness or willful misconduct of Licensor, (ii) any breach of Licensor's representations, warranties or covenants hereunder, or (iii) the misappropriation by Licensor of any of Licensee's Confidential Information. No royalties shall be due after resolution of the particular infringement or claim covered by this Section 8.2 until Licensee has been made whole in relation to the foregoing, provided that such offsets shall not affect more than 50% of the Minimum Commitment due hereunder if they relate to subsections (a), (b) or (c)(ii). The Minimum Commitment shall be reduced by such offsets in the case of offsets made under subsections (c)(i) or (c)(iii) hereof. If there is a conflict between the terms of Section 8.2 and Section 8.3, the terms of Section 8.2 shall prevail.

   Section 8.3    Third Party License Fee. If, during the term of this Agreement, Licensee is required to take a royalty-bearing license under intellectual property rights owned by a third party in order to make, have made, use, sell, offer for sale, import or export Licensed Products as a result of the Patent Rights or Know How granted hereunder, or any part of them, being challenged or adjudged as infringing on a third party's intellectual property rights, Licensee may deduct from the royalties due hereunder on such Licensed Products the amount of royalties due to such third party; provided that in no event shall such deduction affect the Minimum Commitment due hereunder.

Section 8.4     Limitation of Liability. EXCEPT FOR EITHER PARTY'S BREACH OF SECTION 9, LICENSOR'S BREACH OF SECTION 5, AND FOR LICENSEE'S RIGHTS UNDER SECTION 8.2, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY UNDER OR AS A RESULT OF THIS AGREEMENT FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, TREBLE, EXEMPLARY, AND/OR PUNITIVE DAMAGES REGARDLESS OF HOW SUCH DAMAGES ARISE AND WHETHER SUCH DAMAGES ARE CLAIMED UNDER CONTRACT, TORT, STRICT LIABILITY, OR ANY OTHER LEGAL THEORY.  THIS LIMITATION APPLIES REGARDLESS OF WHETHER THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 9.    CONFIDENTIALITY

Section 9.1     Confidential Information.  With respect to all Confidential Information furnished by Licensor to Licensee or by Licensee to Licensor, each party acknowledges and agrees that the disclosing party's Confidential Information is confidential and proprietary.  Each party, as a receiving party, shall (a) hold all Confidential Information of the disclosing party in confidence and not disclose Confidential Information to anyone except its affiliates, sublicensees, or their respective employees or permitted contractors, who have a need to know; (b) use the Confidential Information only as necessary to enjoy the benefits of this Agreement and to perform their respective obligations hereunder; (c) protect the confidentiality of and take all steps necessary to prevent disclosure or unauthorized use of the disclosing party's Confidential Information to prevent it from falling into the public domain or the possession of persons not legally bound to maintain its confidentiality; and (d) advise the disclosing party in writing if the receiving party becomes aware of any misappropriation or misuse of Confidential Information by any person.

Section 9.2     Exclusions.  The term Confidential Information shall not include any item of information which: (a) the receiving party can prove was in its possession prior to disclosure thereof by the disclosing party; (b) is or becomes generally available to the public other than as a result of any action or omission by the receiving party; (c) is rightfully disclosed to the receiving party by a third party without the imposition on the third party of any confidentiality obligation or restrictions on use; (d) the disclosing party states in writing should not be considered to be confidential; or (e) is independently developed by the receiving party without reference to the disclosing party's Confidential Information, as evidenced by the receiving party's written records. The burden of proving if the Confidential Information falls within one or more of the exceptions set forth above shall be upon the receiving party.

Section 9.3     Compelled Disclosure.  If either receiving party is requested or required by law or legal process to disclose any of the disclosing party's Confidential Information, the person required to disclose such Confidential Information shall provide the disclosing party with prompt oral and written notice, so that the disclosing party may seek a protective order or other appropriate remedy.  In the event that such a protective order or other remedy is not promptly obtained, the receiving party shall furnish only that portion of the disclosing party's Confidential Information which in the opinion of such person's counsel is legally required and shall exercise its best efforts to obtain a protective order or other reliable assurance that confidential treatment shall be accorded to the disclosing party's Confidential Information.

Section 9.4   Injunctive Relief.  Each party, as a receiving party, agrees that remedies at law are inadequate to protect against its breach of this Section 9.  Accordingly, each party agrees that the other party may seek injunctive relief against it/him in the event of any such breach or threat thereof, in addition to any other legal or equitable remedies that may be available.

**10.   TERM AND TERMINATION**

Section 10.1   Term.  This Agreement shall commence on the Effective Date and shall extend to the expiration of the last to expire of the patents included in Patent Rights, unless earlier terminated as set forth herein.

Section 10.2   Early Termination.  Notwithstanding the terms of Section 10.1, in addition to the other termination rights set forth herein, the parties may terminate this Agreement early as follows:

(a)   Licensor may terminate this Agreement if any bankruptcy, reorganization, debt arrangement or other proceedings under any bankruptcy or insolvency law shall be instituted by or against Licensee, and, if instituted against Licensee, shall have been consented to or acquiesced in by Licensee, or shall remain undismissed for sixty (60) days, or an order for relief shall have been entered against Licensee, and such termination shall be effective immediately upon receipt by Licensee of written notice from Licensor;

(b)   Licensee may terminate this Agreement if any bankruptcy, reorganization, debt arrangement or other proceedings under any bankruptcy or insolvency law shall be instituted by or against Licensor, and, if instituted against Licensor, shall have been consented to or acquiesced in by Licensor, or shall remain undismissed for sixty (60) days, or an order for relief shall have been entered against Licensor, and such termination shall be effective immediately upon receipt by Licensor of written notice from Licensee;

(c)   Licensor may terminate this Agreement if Licensee is in material breach of this Agreement, and has failed to cure such breach within (30) days of the receipt of written notice of breach from Licensor, and such termination shall be effective immediately upon receipt by Licensee of written notice from Licensor;

(d)   Licensee may terminate this Agreement if Licensor is in material breach of this Agreement, and has failed to cure such breach within (30) days of the receipt of written notice of breach from Licensee, and such termination shall be effective immediately upon receipt by Licensor of written notice from Licensee;

(e)   Licensee may terminate this Agreement or its license to any of the Patent Rights or Know How or Trademarks at any time for cause or for no reason at all with ninety (90) days prior written notice to Licensor. If Licensee terminates a license of particular rights, on the effective date of termination of such license rights, this Agreement shall be deemed to be modified accordingly.

Section 10.3   Insolvency of Licensor. The parties intend for the license of the Patent Rights, Know How and Trademarks granted in Sections 2.1 and 2.2 to come within the scope of Section 365(n) of the U.S. Bankruptcy Code and for such licenses to remain in full force and effect upon and in spite of any insolvency or bankruptcy of Licensor, if Licensee elects to retain such license in accordance with the terms and conditions of this Agreement and provided that Licensee is not otherwise in material breach of this Agreement.

Section 10.4    Effect of Termination of the Agreement.  Upon termination or expiration of this Agreement, without limiting either party's rights and remedies at law and in equity:

(a)    except as necessary to perform under Section 10.6, Licensee shall immediately cease its use of the Patent Rights and Trademarks as of the effective date of such expiration or termination, and Licensor's right to use the Patent Rights and Trademarks shall resume;

(b)    upon the termination or expiration of the last-to-expire of the Patent Rights hereunder, Licensee may use the Know How on a royalty-free basis in perpetuity;

(c)    Licensee shall pay to Licensor all royalty amounts due for Licensed Products sold prior to the effective date of termination and under Section 10.6;

(d)    if Licensee terminates this Agreement under Section 10.2(e), Licensee shall be obligated to pay the full Minimum Commitment due for the year in which Licensee terminates this Agreement;

(e)    except to the extent necessary under Section 10.6, within thirty (30) days of the effective date of termination, each party shall deliver to the other party all copies of the other party's Confidential Information;

(f)    Licensee, shall not, by reason of the expiration or termination of this Agreement be liable to Licensor for compensation or damages either on account of present or prospective profits on sales or anticipated sales, or on account of expenditures, investments or commitments made in connection therewith or for any other reason; and

(g)    any sublicenses previously granted by Licensee for the Patent Rights pursuant hereto shall immediately terminate.

Section 10.5    Survival.  Any expiration of or termination of this Agreement shall not affect the respective rights and obligations in the following Sections: 1, 3.1(b), (c) and (d), 5, 8, 9, 10.4, 10.5, 10.6 (until complete) and 11.

Section 10.6    Disposition of Licensed Products.  Upon expiration or termination of this Agreement, Licensee shall diligently dispose of all previously made Licensed Products and/or complete in good faith the manufacture and disposition of any partially made Licensed Products, provided, however, that for a period of two years from the effective date of expiration or termination the sale of such Licensed Products shall remain subject to the terms of this Agreement including, but not limited to, the payment of royalties at the rate and at the time provided herein and the rendering of royalty reports thereon. Licensee shall destroy or donate any inventory of Licensed Products remaining at the end of such two year period.

## 11.    MISCELLANEOUS

Section 11.1    No Agency.  The parties are independent contractors and not partners, joint venturers or otherwise affiliated, and neither party has the right or authority to bind the other party in any way.  Neither party hereto is an agent or legal representative of the other party for any purpose. Neither party shall enter into any contracts in the name of, or on behalf of the other party, nor will either party be entitled to pledge the credit of the other party in any way or hold itself out as having authority to do so.

Section 11.2   <u>Force Majeure</u>.  The parties to this Agreement shall be excused from any performance required hereunder if such performance is rendered impossible or unfeasible due to any catastrophes or other major events beyond their reasonable control, including without limitation, war, terrorist attacks, riot, and insurrection; laws, proclamations, edicts, ordinances, or regulations; strikes, lock-outs, or other serious labor disputes; and floods, fires, explosions, or other natural disasters.  When such events have abated, the parties' respective obligations hereunder shall resume.

Section 11.3   <u>Choice of Law</u>.  This Agreement shall be governed and interpreted, and all rights and obligations of the parties shall be determined, in accordance with the laws of the State of Washington, without regard to its conflict of laws rules.

Section 11.4   <u>Venue</u>.  Any action at law, suit in equity, or judicial proceeding of any kind arising directly, indirectly, or otherwise in connection with, out of, related to or from this Agreement or the relationship between the parties shall be litigated exclusively in the courts of the State of Washington, County of Clark and the parties waive any right they may have to challenge the jurisdiction of this court or seek to bring any action in any other forum, whether originally or by transfer, removal, or change of venue.

Section 11.5   <u>Notices</u>.  All communications and notices to a party hereunder shall be in writing and shall be deemed to have been duly given if delivered personally to such party or sent to such party by email transmission (reader receipt requested) or by registered or certified mail, postage prepaid, to the addresses set forth above or email address below (or to such other address as the addressee may have specified in notice duly given to the sender as provided herein):

If to Licensee: email: jeckmann@nautilus.com

If to Licensor: email: robertlyden@comcast.net

Such notice, request, demand, waiver, consent, approval or other communications will be deemed to have been given as of the date so effectively delivered or sent by email, or five days after so mailed.

Section 11.6   <u>Severability</u>.  In the event that any provision of this Agreement shall be found in any jurisdiction to be in violation of public policy or illegal or unenforceable in law or equity, such finding shall in no event invalidate any other provision of this Agreement in that jurisdiction, and this Agreement shall be deemed amended to the minimum extent required to comply with the law of such jurisdiction.

Section 11.7   <u>Entire Agreement; Amendment</u>.  This Agreement, along with the Exhibits attached which are hereby incorporated by reference herein, states the entire agreement reached between the parties hereto with respect to the transactions contemplated hereby and supersedes all previous and contemporaneous agreements by and between the parties, as well as all proposals, oral or written, and all negotiations, conversations or discussions heretofore had between the parties related to this Agreement. Without limiting the generality of the foregoing, this Agreement supercedes the Non-Disclosure Agreement between Licensee and Licensor dated as of June 2006 for all disclosures made with respect to the subject matter hereof after the Effective Date.  Except as set forth in Section 10.2, this Agreement may not be amended or modified except by written instrument attached hereto.

Section 11.8   <u>No Waiver</u>.  The failure of a party to enforce at any time, or for any period of time, any provision of this Agreement shall not be construed as a waiver of such provision or

of the right of such party thereafter to enforce each and every provision. Any waiver by a party of any of its rights under this Agreement shall be in writing signed by such party.

Section 11.9   Assignment. Neither party shall assign this Agreement nor any of its respective rights or obligations hereunder without the prior written consent of the other party, which consent will not be unreasonably withheld, except that Licensee may assign this Agreement to any successor in interest by operation of law, or pursuant to a merger, corporate reorganization, sale of all or substantially all of Licensee's business or assets or sale of all or substantially all of Licensee's business or assets relating to the footwear business covered by the Patent Rights, Know How or Trademarks without such consent. Any prohibited assignment shall be null and void. Notwithstanding the foregoing, this Agreement shall inure to the benefit of successors and permitted assigns.

Section 11.10   Counterparts. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be deemed to be an original, and all of which taken together shall constitute one and the same instrument.

Section 11.11   Rules of Construction. The following rules shall govern the interpretation and construction of this Agreement:

(a)     All headings for articles and sections are for convenience only and shall not limit, alter, or otherwise affect the construction or interpretation of this Agreement.

(b)     Whenever the context so requires, the neutral gender shall include the feminine or masculine, the feminine shall include the masculine and vice versa, and the singular number shall include the plural and vice versa.

(c)     Each party hereto has had the opportunity to seek advice of counsel regarding the drafting and negotiation of this Agreement. Any rule of construction disfavoring the drafting party shall not apply in the construction of any provision of this Agreement.

20

# EXHIBIT A

## APPAREL PATENT RIGHTS

**The following United States Utility Patents:**

U. S. Patent 6,353,940, granted March 12, 2002, entitled "Underwear."

U.S. Patent 6,243,880, granted June 12, 2001, entitled "Athletic Shorts."

U.S. Patent 6,243,879, granted June 12, 2001, entitled "Anatomical and Shock-Absorbing Athletic Pants."

**The following United States design patents:**

U.S. Design Patent 473,694, granted April 29, 2003, entitled "Athletic Pants with Back Pocket."

U.S. Design Patent 467,055, granted December 17, 2002, entitled "Athletic Shorts."

U.S. Design Patent 466,676, granted December 10, 2002, entitled "Athletic Pants with Zippers."

U.S. Design Patent 463,652, granted October 1, 2002, entitled "Non-Stretch Front Waistband Portion For Wearing Apparel."

U.S. Design Patent 463,091, granted September 24, 2002, entitled "Woman's Underwear / Inner Liner For Athletic Shorts."

U.S. Design Patent 461,943, granted August 27, 2002, entitled "Athletic Pants."

U.S. Design Patent 461,622, granted August 20, 2002, entitled "Men's Underwear / Inner Liner For Athletic Shorts."

A-1

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the day and year first above written.

**DashAmerica, Inc.**                                    **Robert M. Lyden**

By: _Jürgen Eckmann_                    _____

Name: _JUERGEN ECKMANN_

Title: _PRESIDENT_

## EXHIBIT C

### MINIMUM COMMITMENT

| Each year of this Agreement commencing on first day of Phase II, e.g. July 1 to June 30 of following year | Minimum Commitment is the applicable Pool Percentage of the following amounts (for example, if the applicable Pool Percentage is 70%, then the Minimum Commitment for Year 1 would be 70% of $150,000 or $105,000): |
|---|---|
| 1 | US$150,000 |
| 2 | US$250,000 |
| 3 | US$350,000 |
| 4 | US$350,000 |
| 5 and thereafter, subject to Section 4.3(b) | US$350,000 |

C-1

# EXHIBIT B

## FOOTWEAR PATENT RIGHTS

**The following patents and pending utility patent applications:**

U.S. Patent Application Serial Number 11/519,166, filed September 11, 2006, entitled "Custom Article of Footwear and Method of Making the Same."

U.S. Patent 7,107,235, granted September 12, 2006, entitled "Customized Article of Footwear and Method of Conducting Retail and Internet Business."

U. S. Patent 7,016,867, granted March 21, 2006, entitled "Method of Conducting Business Including Making and Selling A Custom Article of Footwear."

U.S. Patent 6,601,042, granted July 29, 2003, entitled "Customized Article of Footwear and Method of Conducting Retail and Internet Business."

U.S. Patent 6,449,878, granted September 17, 2002, entitled "Article of Footwear Having a Spring Element and Selectively Removable Components."

UK Patent 2,379,155, granted November 3, 2004, entitled "Customized Article of Footwear and Method of Conducting Retail and Internet Business."

UK Patent 2,376,409, granted December 3, 2003, entitled "Article of Footwear Having a Spring Element and Selectively Removable Components."

**The following United States design patent:**

U.S. Design Patent 507,094, granted July 12, 2005, entitled "Spring Element For An Article of Footwear."

## INSOLE PATENT RIGHTS

**The following United States utility patents relating to insoles:**

U.S. Patent 6,939,502, granted September 6, 2005, entitled "Method of Making Custom Insoles and Point of Purchase Display."

U.S. Patent 5,632,057, granted May 27, 1997, entitled "Method of Making Light Cure Component for Articles of Footwear."

# EXHIBIT E

## DISCLOSURE AGAINST SECTION 5.1(G)

Adidas soccer shoe system (+F 50.6 "Tunit"™)

# EXHIBIT D

## TRADEMARKS

**The following trademarks applications:**

U.S. Trademark Application, Serial Number 76/ 459,378, filed October 7, 2002, allowed.

Chinese Trademark Application, Serial Number 5313647, filed April 25, 2006, pending.

# EXHIBIT F

## SPRING SOLE PATENT RIGHTS

U.S. Patent No. 5,367,790
U.S. Patent No. 5,701,686
U.S. Patent No. 6,029,374